Walter A. SALERNO, Plaintiff,

v.

LEICA INC., Defendant.

No. 00–CV–0598C(F).

United States District Court, W.D. New York.

Feb. 22, 2001.

Kavinoky & Cook, LLP (Joseph J. Welter, of counsel), Buffalo, NY, for Plaintiff.

Bond, Schoeneck & King, LLP (Robert A. Doren, of counsel), Buffalo, NY, for Defendant.

## INTRODUCTION

CURTIN, District Judge.

Under the civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, plaintiff Walter Salerno ("Salerno") commenced this action to collect severance benefits that he claims are owed to him by his former employer, defendant Leica, Inc. ("Leica"). Leica argues that Salerno's ERISA claims are barred by the doctrine

of *res judicata* and moves for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Item 3.

## BACKGROUND

Between 1987 and December 1997, Salerno was an executive in the Buffalo offices of Leica's optical products division. Item 1, ¶¶ 4, 18. Salerno worked as a manager in the Buffalo Division from 1986 until 1990. *Id.* ¶¶ 5, 7. In 1990, he was promoted to the position of vice-president for the Buffalo Division. *Id.* ¶ 7. Then, in April 1992, Leica named Salerno president of the Buffalo Division. *Id.* ¶ 8.

In May 1996, Eric Poll, Leica's Corporate Director for Human Relations, recommended that an outside consultant be retained to work with Salerno on issues of management style. *Id.* ¶¶ 10–11. In light of Poll's recommendations, Leica proposed a six-month program of intensive supervision and evaluation for Salerno. *Id.* ¶ 11. Salerno and two Leica representatives executed a written agreement to formalize the terms of the six-month program ("the Agreement"). The Agreement provided that at the end of the six-month period Salerno either would continue to work for Leica or Leica could opt to terminate Salerno's employment. *Id.* ¶ 11. The Agreement further provided that if Leica chose to terminate Salerno, Leica would grant him a severance package commensurate with his experience, history, and position with Leica. *Id.* ¶¶ 11–14 and Exh. A. In early December 1996, approximately five months into the six-month program, Leica determined that Salerno was not making adequate progress and decided to termi-

nate his employment immediately. *Id.* ¶¶ 11, 17, and 18.

Salerno now claims that Leica violated the terms of the Agreement by failing to provide him with adequate severance benefits. Salerno states that Leica offered him a severance package valued at $139,500, Item 7, p. 5, but insists that the Agreement entitles him to a severance package worth just over $287,000. *See* Item 1, ¶¶ 19–21. Salerno claims that Leica is liable under ERISA for its failure to pay him his properly calculated severance benefits.

## FACTS

The present action is the third of three lawsuits that Salerno has commenced against Leica since his termination in December 1996.

### I. The State Action

Salerno commenced his first action against Leica on March 24, 1997, in New York State Supreme Court, County of Erie (*Salerno v. Leica, Inc.*, Index No.1997/2527) ("the State Action"). *See* Item 5, ¶ 4 and Exh. A. Salerno's complaint in the State Action is substantially identical to his complaint in the present action. *Compare* Item 1 *with* Item 5, Exh. A. In the State Action, Salerno asserted various breach of contract claims under State common law and also asserted a violation of the State's Wage Payment Law. *Id.* Exh. A, pp. 4–7.[1] After discovery was completed, Leica moved to dismiss Salerno's complaint. In relevant part, Leica argued that Salerno's claim for severance benefits was barred on the grounds of ERISA preemption. Item 5, ¶ 6.[2] Justice

1. At argument, the court questioned counsel on why the severance benefit claim was not pled under ERISA. Counsel briefly explained that careful research and consideration of the matter led him to prosecute the case as a simple breach of contract claim. Counsel also pointed out that the question of whether a contract constitutes a "plan" under ERISA often is a difficult one to answer with certainty.

2. Leica had also argued that the Agreement was legally unenforceable. By a separate order, Justice Thomas P. Flaherty rejected that argument and found that the Agreement was enforceable.

Thomas P. Flaherty heard oral argument on this aspect of Leica's motion to dismiss on April 26, 1999. Item 8, Exh. D. At argument, Justice Flaherty questioned Leica's counsel on the issue of ERISA preemption and on the status of an ongoing federal lawsuit involving the same parties:

THE COURT: ... Is there an ERISA cause of action alleged [in this action]—

MR. DOREN: No.

THE COURT: Is there in the federal action?

MR. DOREN: No.

THE COURT: There isn't.

MR. DOREN: No. The federal action alleges the same commonality of facts but alleges that because of age and national origin somehow he was offered less than he was entitled to, but in nowhere does he allege it [*i.e.*, an ERISA claim] and that's what he should have done and when it's combined.

. . . . .

THE COURT: Not in either jurisdiction.

MR. DOREN: Right.

THE COURT: No ERISA claim.

MR. DOREN: Not yet. That's why we're here.

Item 8, Exh. D, p. 6. Later in the argument, Mr. Doren went on to state that:

an ERISA cause of action should have been brought from day one and [Salerno] has the right to amend. We ask that the complaint be dismissed, ERISA cause of action can be brought, [we will] likely remove it to Federal Court and we'll have one lawsuit. And contrary to plaintiff's contention, we didn't have the right to remove it. We certainly would, upon amendment, and then we can proceed.

Item 8, Exh. D, pp. 18–19. By an order dated June 21, 1999, Justice Flaherty granted Leica's motion and dismissed Salerno's complaint. Item 5, Exh. C. As to the issue of severance benefits, Justice Flaherty reasoned that the Agreement of June 1996 between Leica and Salerno—at least as it concerned a severance package—constituted a "plan" under ERISA. Thus, Justice Flaherty ruled that ERISA preemption barred Salerno from asserting State law claims on the basis of Leica's alleged breach of the Agreement. Item 5, Exh. C, pp. 3–4.

In dismissing the complaint, Justice Flaherty left the door open for Salerno to pursue his severance benefit claims elsewhere: "The Complaint is dismissed, in its entirety, and without prejudice to Plaintiff proceeding as advised relative to pleading an ERISA claim in the pending related federal litigation between the parties." Item 5, Exh. C, p. 6. On May 10, 2000, the Fourth Department affirmed Justice Flaherty's decision. *Id.* Exh. B. At oral argument, the court learned that the State Court of Appeals recently denied Salerno's application for leave to appeal.

## II. The First Federal Action

Through different counsel, Salerno commenced a federal employment discrimination lawsuit on December 11, 1997, here in the Western District of New York (*Salerno v. Leica, Inc.*, 97–CV–973S(H) ("the First Federal Action")). Item 5, ¶ 10. In that action, Salerno claimed that his termination and loss of employment benefits were the result of age and national origin discrimination. Item 5, Exh. E, pp. 4–6. As a result of this alleged discrimination, Salerno claimed he had lost his job as well as "future wages, bonuses and other employment benefits...." Item 5, Exh. E, ¶ 38.

Salerno made specific mention of severance benefits in his factual allegations: "In connection with his termination, plaintiff was denied a separation package compara-

ble to those of younger and/or European employees who were terminated, including employees terminated for poor performance." Item 5, Exh. E, ¶ 15. Thus, Salerno claimed that his severance package was discriminatory in that it did not measure up to other severance packages offered to similarly situated Leica executives who were either younger than Salerno or of a European national origin.

On February 26, 1999, Leica moved for summary judgment. On July 7,1999, the Hon. William M. Skretny dismissed Salerno's claims in a ruling read from the bench. Item 5, Exh. F. In the ruling's recitation of facts, Judge Skretny acknowledged the June 1996 Agreement and Salerno's severance benefits:

> The agreement also contained a provision for "alternative options for further development" or "a severance package commensurate with [Salerno's] level of contribution and position" if the program was unsuccessful.
>
> . . . . .
>
> Thereafter, Plaintiff claims he was offered a severance package worth significantly less that [sic] what he was entitled to under his agreement and based on past practice.

Item 5, Exh. F, p. 6.

However, judgment was not entered in the First Federal Action until August 6, 1999. *See* Item 69 of 97–CV–973S(Sc).

### III. The Second Federal Action

Finally, Salerno commenced the present action against Leica on July 10, 2000 ("the Second Federal Action"). Item 1. This action is a continuation of the State Action, since plaintiff again asserts a claim for unpaid severance benefits. In this action, though, Salerno bases his claim on the civil enforcement provisions of ERISA, 29 U.S.C. § 1132.

## DISCUSSION

Leica argues that Salerno's present lawsuit is barred by the doctrine of *res judicata*. Salerno responds first by contending that the doctrine of judicial estoppel prevents Leica from asserting the doctrine of *res judicata*. In the alternative, Salerno disputes that Judge Skretny's disposition in the First Federal Action has a preclusive effect on the present action. Salerno maintains that action and this action are not "transactionally related" because different evidence would be needed to prove the different claims asserted in the two federal actions.

### I. Judicial Estoppel

██ "Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits." *Wight v. Bankamerica Corp.*, 219 F.3d 79, 89 (2d Cir.2000) (citing *Bates v. Long Island R.R.*, 997 F.2d 1028, 1037–38 (2d Cir.1993)).

A party invoking judicial estoppel must show that: (1) his adversary advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner. There must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel. *Id.* at 90 (citation and quotation omitted).

█ In this case, Salerno argues that judicial estoppel arises based on statements that Mr. Doren, Leica's counsel, made to Justice Flaherty during oral argument in the State Action. *See* Item 7, p. 9. However, Salerno fails to cite a case remotely on point with the facts involved here. Instead, Salerno relies on the logical force of his argument in attempting to

show why Leica should be estopped from asserting *res judicata.*

As to the first prong of the test, Salerno states that Mr. Doren urged Justice Flaherty to dismiss Salerno's claims without prejudice so that Salerno could then pursue his claims under ERISA in federal court. *Id.* Salerno argues that Mr. Doren's request for a dismissal without prejudice is directly contrary to his present argument that Salerno's ERISA claims must be barred by the doctrine of *res judicata.*

As to the second prong, Salerno points out that Justice Flaherty clearly adopted Mr. Doren's idea that the severance claims should be dismissed without prejudice and then asserted in federal court. *See* Item 5, Exh. C, pp. 5–6. Salerno contends that if Justice Flaherty had known that the First Federal Action would be dismissed so soon after dismissal of the State Action, then he never would have dismissed the State Action without giving Salerno more time to file in federal court. That is, Justice Flaherty dismissed the State Action on June 21, 1999, without knowing that the First Federal Action would be dismissed as of August 6, 1999.[3] Finally, Salerno contends that contrary to Leica's argument, the "mere sixteen days" between Justice Flaherty's opinion and Judge Skretny's opinion did not provide him with a "fair opportunity" to incorporate his ERISA claims in his action in this court. Item 7, p. 12. In sum, Salerno argues that this court should not allow Leica to "use this serendipitous timing of events to cheat [Salerno] out of his severance benefits." *Id.* at 12–13.

Salerno's arguments on judicial estoppel do not carry the day. Through Mr. Doren, Leica did not take a position in the State Action that was inconsistent with the *res judicata* argument it now asserts. In

making his statements to Justice Flaherty on April 26, 1999, Mr. Doren essentially recognized two things: (i) that Salerno had not yet asserted an ERISA claim in either the State or the First Federal Action, *see supra* pp. 379–80 (citing Item 8, Exh. D, p. 6), and (ii) that Salerno would be free to assert his ERISA claims in the First Federal Action, *see supra* p. 380 (citing Item 8, Exh. D, pp. 18–19). These two positions, even when taken together, are not contrary to Leica's current argument that the First Federal Action, which was dismissed on the merits, has a preclusive effect on the current action.

Moreover, there is no clear evidence that Justice Flaherty "adopted" Mr. Doren's representations regarding the dismissal without prejudice. Rather, Justice Flaherty dismissed Salerno's claims for severance benefits on the basis of ERISA preemption, not as a result of what Mr. Doren said at oral argument. *See* Item 5, Exh. C. pp. 2–4. Moreover, the record does not indicate that Leica is "play[ing] fast and loose with the courts ... through the deliberate adoption of inconsistent positions in successive suits." *Wight,* 219 F.3d at 89. As a result, Leica will not be judicially estopped from asserting the doctrine of res judicata as a defense to Salerno's present action in my court.

## II. *Res Judicata*

Leica insists that the First Federal Action precludes Salerno from asserting his ERISA claims here in the Second Federal Action. In *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86 (2d Cir.1997), the Second Circuit clearly set forth the doctrine of *res judicata.*

Res judicata operates as "claim preclusion." Generally, a judgment in an

---

**3.** Although Judge Skretny issued a decision from the bench on July 7, 1999, judgment was not entered until August 6, 1999. *See supra.*

action precludes the parties ... from relitigating issues that were or could have been raised in that action. More specifically: the doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, it is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

*Id.* at 90 (quotation and citation omitted) (internal formatting omitted). In determining whether two different suits arose from the same "cause of action," the *Interoceanica* court advised that

> It must first be determined that the second suit involves the same "claim"— or "nucleus of operative fact"—as the first suit.... [W]hether the same transaction or connected series of transactions is at issue, [and] whether the same evidence is needed to support both claims. To ascertain whether two actions spring from the same "transaction" or "claim," we look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Id.* at 90. Thus, the court must "look to whether the underlying facts" of the two cases "are related in time, space, origin, or motivation, whether they [would have] form[ed] a convenient trial unit, and whether their treatment as a unit [would have] conform[ed] to the parties' expectations...." *Id.*

■ A comparison of the complaints from the two Federal Actions reveals that Salerno asserted claims for severance benefits in both actions and, as a result, that the two cases share a common core of operative facts. The complaints in both Federal Actions allege: (i) that Salerno worked for Leica from 1986 until 1996 in "several capacities of increasing responsibility" and met with great success during his tenure, *cf.* Item 5, Exh. E, ¶¶ 6–7 *with* Item 5, Exh. H, ¶¶ 4–9; (ii) that in June 1996, Salerno and his supervisors executed a document in which they formally agreed that he would enter into a six-month program of intense supervision designed to improve Salerno's management style, *cf.* Item 5, Exh. E, ¶¶ 10–11 *with* Item 5, Exh. H, ¶¶ 10–12,14; (iii) that Salerno was nevertheless terminated in early December 1996, Item 5, Exh. E, ¶¶ 12, 14 *with* Item 5, Exh. H, ¶ 18; and (iv) that after Salerno was terminated, Leica failed to provide him with an appropriate severance package, *cf.* Item 5, Exh. E, ¶ 15 *with* Item 5, Exh. H, ¶¶ 11, 14, 20–21.

Notwithstanding the substantial identity of the factual allegations, Salerno contends that the two federal actions involve different causes of actions or "transactions." Salerno argues that the central question of fact in the First Federal Action was whether discriminatory intent motivated Leica to terminate him, Item 7, pp. 15–16, while the central inquiry in this action will be whether Leica violated his rights under ERISA by denying him a severance package to which he was contractually entitled. Here, Salerno relies on the following language from *Interoceanica:*

> [T]he fact that both suits involved essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues. A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both

claims, and where the facts essential to the second were present in the first. *Id.* at 91 (citation and quotation omitted). Seizing on *Interoceanica's* "same evidence" language, Salerno contends that the evidence "needed to support" the discrimination claims in the First Federal Action is entirely different from the evidence that will be needed to support the severance claims under ERISA here in the Second Federal Action. *See* Item 7, pp. 15–19. Salerno observes that the issue of discriminatory intent will be irrelevant in this case since the question here is whether Leica honored Salerno's contractual right to receive severance benefits.

Yet, Salerno fails to adequately address the fact that, in the First Federal Action, he specifically alleged that Leica denied him an adequate severance package. "In connection with his termination, plaintiff was denied a separation package comparable to those of younger and/or European employees who were terminated, including employees terminated for poor performance." Item 5, Exh. E, ¶ 15. Further, Salerno's demand for relief in the First Federal Action included a claim for unspecified "employment benefits." Item 5, Exh. E, ¶ 38. This demand for unspecified employment benefits, when viewed together with Salerno's specific allegation regarding severance benefits, demonstrates that the First Federal Action involved both a claim for discriminatory discharge *and* a claim for discriminatory denial of severance benefits.

Put another way, in establishing a prima facie claim for discriminatory denial of severance benefits in the First Federal Action, Salerno would have had to show, among other things: (i) that he suffered an adverse employment action; and (ii) that the circumstances surrounding the adverse action created a reasonable inference of discriminatory intent. *See, e.g., Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37

(2d Cir.1994). In order to prove an adverse employment action, Salerno alleged that Leica offered him a severance package of a lesser value than those that were offered to similarly situated European employees or to similarly situated employees who were not in Salerno's protected age group. In other words, the adverse action was that Leica did not offer him what he was truly owed in terms of severance benefits. Similarly, the gravamen of Salerno's present complaint is that Leica has violated ERISA by refusing to grant him a severance package that pays him what he is owed. In this way, the First and Second Federal Actions share a substantially identical set of underlying facts. It might even be said that Salerno would only have had to prove "half as much" in this case as he would have had to prove in the First Federal Action.

Thus, the underlying facts of the First and Second Federal Actions constitute a connected series of transactions. That is, the underlying facts of the two Federal Actions are related in time, space, and origin and would have formed a logical and convenient trial unit. As a result, *res judicata* applies, and the First Federal Action acts as a bar to the present one.

The few cases that are directly on point confirm the court's analysis. In *King v. Union Oil Co. of California*, 117 F.3d 443 (10th Cir.1997), the Tenth Circuit found that *res judicata* applied in a case substantially similar to the present one. In *King*, the plaintiff was terminated by his employer in September 1992 as a part of a reduction in force. *Id.* at 443. In September 1993, plaintiff commenced an action in federal court alleging that discriminatory intent had motivated his termination. *Id.* A jury returned a verdict in the employer's favor in May 1994. In September 1994, the plaintiff commenced a second action against his former employer, in which he

claimed entitlement to severance benefits under ERISA. *Id.* After the district court held that *res judicata* did not bar the second action, the Tenth Circuit reversed and held that *res judicata* barred the plaintiff's second action. *Id.* at 447. The *King* court employed the same common-sense "transaction" analysis that the Second Circuit sets forth in *Interoceanica* and, more recently, in *Waldman v. Village of Kiryas Joel,* 207 F.3d 105 (2d Cir.2000). *Cf. Interoceanica,* 107 F.3d at 88, *and Waldman,* 207 F.3d at 108, *with King,* 117 F.3d at 445 (setting forth substantially similar tests and endorsing language in *Restatement (Second of Judgments* § 24)). Thus, both the facts and law in *King* were substantially similar to those that this court faces here.

■ Salerno insists that *King* is not on point because unlike the plaintiff in *King,* Salerno "commenced the State Action to collect his severance benefits before [he ever filed the First] Federal Action involving discrimination [claims]." Item 7, p. 21. Salerno's attempt to distinguish *King* in this way is unpersuasive. The State Action is irrelevant to the court's *res judicata* analysis and does not represent a material distinction between this case and *King.* *King* is compelling authority because, like the present case, it involved a plaintiff who commenced one federal action in which he alleged employment discrimination, and later commenced a Second Federal Action in which he alleged ERISA claims.[4]

Salerno implies that he should be excused from his failure to incorporate the severance claims into the First Federal Action because there were just sixteen

days between the State Court's dismissal and Judge Skretny's dismissal of the First Federal Action and, with the intervening July 4 holiday, a mere ten business days in which he could have amended his federal complaint. *See* Item 7, p. 12. Yet, it was conceded at oral argument that there were far more than sixteen calendar days between dismissal of the State Action and the First Federal Action. While Judge Skretny issued a ruling from the bench on July 7, 1999, the judgment was not ultimately entered until August 6, 1999. *See* Item 69 of 97–CV–973S(Sc). Thus, there were approximately forty-six (46) days between dismissal of the State Action and the First Federal Action. There is no explanation for why counsel did not, within those 46 days, move Judge Skretny's court to reopen the First Federal Action by granting leave to incorporate the ERISA theory of relief. Indeed, plaintiff's counsel was able to file a notice appeal of Justice Flaherty's decision by June 30, 1999. *See* Item 10, Exh. A.

Furthermore, Leica's answer in the State Action, filed in September 1997, put Salerno on notice that his State Action severance claims might be subject to ERISA preemption. Item 5, Exh. B, p. 7. Similarly, Leica's motion papers, which were filed prior to oral argument on April 26, 1999, notified Salerno that ERISA preemption would be an issue. Then, at oral argument held before Justice Flaherty, Salerno's attorney heard the court inquire repeatedly as to whether any claims had yet been asserted under ERISA. Item 8, Exh. D, p. 6. Thus, Salerno's claim that he had only ten business days in which to

---

4. Indeed, the State Action is irrelevant to a *res judicata* analysis because a State Court's dismissal without prejudice on the basis of ERISA preemption could never form the basis for an application of *res judicata. See, e.g., Thomas v. Best,* 104 A.D.2d 37, 482 N.Y.S.2d 368, 371–72 (3d Dep't 1984) (noting that ERISA preemption divests State Courts of subject matter jurisdiction); *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1188 (2d Cir.1996) ("[A] dismissal based on lack of subject matter jurisdiction ... is not on the merits, [and therefore] it can have no res judicata effect.").

amend his complaint in the First Federal Action is not entirely accurate. Moreover, there was nothing to prevent plaintiff's counsel from petitioning Judge Skretny's court for relief from the judgment that had been entered in the First Federal Action pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

Furthermore, in *Woods v. Dunlop Tire Corp.*, 972 F.2d 36 (2d Cir.1992), the plaintiff alleged that her employer had terminated her employment on the basis of race and gender. She first filed an EEOC complaint regarding her termination, but soon thereafter commenced an action in the Western District of New York alleging that her termination was a violation of section 301 of the Labor Management Relations Act ("LMRA"). The Hon. John T. Elfvin granted summary judgment in defendant's favor on the LMRA claims. At about that same time, the EEOC issued a right-to-sue letter. Having received the right-to-sue letter, plaintiff filed a second action in the Western District and this time based the action on Title VII. *Id.* at 37–38. Noting that the "identity of facts surrounding the occurrence . . . constitutes the cause of action, not the legal theory upon which [plaintiff] chose to frame her complaint," *id.* at 39, the court of appeals held that plaintiff's Title VII action was barred by *res judicata. Id.* at 40–41.

*Woods* is admittedly distinct from the present action, in that the plaintiff there based both of her actions on a termination. Still, *Woods* resembles this case in that Salerno made his severance benefits an issue in both the First and Second Federal Actions; even if the severance claim was not the focus of the First Federal Action. Moreover, *Woods'* statement of the law is instructive. The *Woods* court reasoned that *res judicata* should apply where the same set of facts would support the claims in both actions.

In opposing Leica's motion, Salerno relies primarily on *Spearman v. General Motors Corp.*, 880 F.Supp. 617 (S.D.Ind. 1994), and *Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223 (7th Cir. 1993). Neither of these cases enables Salerno to evade the application of *res judicata.* In *Spearman,* the court found that *res judicata* did not bar the second suit, reasoning: "The more difficult question is whether Spearman could have litigated his ERISA claims in the previous suit. . . . Because it is unclear whether Spearman's ERISA claim could have been brought earlier, we deny GM's motion for summary judgment based on res judicata." 880 F.Supp. at 620. In this case, it is clear that Salerno could have asserted his ERISA claim in the context of the First Federal Action, since he alleged in the complaint there that Leica had discriminated against him by refusing to offer him proper severance benefits.

Salerno also relies on the Seventh Circuit's decision in *Herrmann,* 999 F.2d 223. *Herrmann* involved two successive actions by an employee against her former employer. In the first suit, the plaintiff brought a claim under ERISA's continuation of medical benefits provision ("COBRA"), 29 U.S.C. §§ 1161–68, and then in the second action, she brought a claim for gender discrimination under Title VII, 42 U.S.C. §§ 2000e to 2000e–17. *Id.* at 224. The court held that because the plaintiff's claims were based on entirely different "factual allegations" and had little or no "factual overlap," *id.* at 226–27, the claims were not sufficiently related for purposes of *res judicata:*

> In the present case, . . . only one fact on which the two claims are based is the same—that the plaintiff was terminated. The other facts on which the Title VII claim is based concern the conduct of the defendant leading up to the plaintiff's discharge, while the other facts on

which the COBRA claim is based concern the processing of her request for continued benefits after she was discharged.

*Id.* at 227. Unlike *Herrmann,* the plaintiff in this case did not first sue on a termination claim and later sue on a factually unrelated denial of post-termination employee benefits (*e.g.,* COBRA benefits). Rather, in both the First and Second Federal Actions, Salerno claimed that Leica had denied him a proper severance package. Unlike *Herrmann,* there is a substantial factual overlap between the two claims at issue here.

## III. Equitable Considerations

 "By its nature, claim preclusion is an equitable doctrine, designed to promote fairness to the victor, judicial efficiency and conservation of public and private resources." *Ramsden v. AgriBank, FCB,* 63 F.Supp.2d 958, 964 (W.D.Wis. 1999), *vacated on other grounds* 214 F.3d 865 (7th Cir.2000). It has been held that *res judicata* will not apply where its "application would … result in manifest injustice." *Tipler v. duPont,* 443 F.2d 125, 128 (6th Cir.1971) (citation omitted). The court recognizes that there is a degree of flexibility to the doctrine of *res judicata* and that courts should pay heed to basic principles of equity when applying it. Yet, application of *res judicata* in this case— while it is unfortunate—does not give rise to a "manifest injustice." As the court has discussed *supra,* Salerno had several options in the First Federal Action, both before and after that case was dismissed. First, Salerno could have incorporated the claim for severance benefits into the First Federal Action long before the filing of dispositive motions. Next, Salerno could have moved the court to consider the severance benefit claim before judgment was entered in early August 1999, and then later had the opportunity to petition the court under Rule 60. The fact that the doctrine of *res judicata* is flexible and rooted in equity does not mean that the court may avoid its application simply because of its own view of the fairness or equity of doing so in a particular case. "[The] doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts...." *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 61 L.Ed. 1148 (1917). For these reasons, the court rejects Salerno's attempt to invoke equity.

## CONCLUSION

In both the First and Second Federal Actions, Salerno asserted claims for wrongly denied severance benefits. In the First Federal Action, Salerno claimed that Leica deprived him of his full severance benefits on a discriminatory basis. Here, in the Second Federal Action, Salerno simply claims that Leica has deprived him of his full severance benefits. The substantial identity of these two claims for severance benefits reveals a substantial factual overlap between the two federal actions. Thus, *res judicata* bars Salerno's present claims, and Leica's motion to dismiss (Item 3) is granted. This matter is dismissed, and the Clerk is directed to enter judgment in favor of defendant.

So ordered.